IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BUDDY G. WILLIAMS,

      Plaintiff,

v.                                                 CIV 02-1025 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Buddy Williams worked as a welder and crane operator until July 1998, when he stopped working at age forty-three because the plant he worked for shut down. He applied for disability benefits in October 1998. Williams alleges that he became disabled when the plant closed down due to diabetes-related symptoms and depression. Plaintiff applied for benefits when he lived in Texas and all of the proceedings occurred there, but his claim was transferred to New Mexico by the Appeals Council. *E.g., Administrative Record* ("*Record*") at 9, 46, 65-66, 113, 128, 132, 134.

Finding Plaintiff's allegations of limitation not entirely credible and, with the assistance of a vocational expert, Administrative Law Judge ("ALJ") Bruce L. Evans concluded that Plaintiff has the residual functional capacity to perform a "full range of sedentary, unskilled work," *id.* at 50, and was not disabled at Step 5 pursuant to Medical-Vocational Rule 201.21, *id.* at 51. The Appeals Council declined review in July 2002, thereby rendering the ALJ's decision final. *Id.* at 4-5.

This matter is before the Court on Plaintiff's Motion to Reverse or Remand, where he asserts that the ALJ committed at least four errors. *See Docs. 13, 14.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. The entire record has been read and carefully considered. I find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

## I.  Standard Of Review

This case originated in Texas, in the Fifth Circuit. Both parties base their arguments on Tenth Circuit law. I have found no authority that requires I consider Fifth circuit law as binding for the purposes of my analysis. Accordingly, I too apply Tenth Circuit precedent.

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## II.  Factual Background

### A.  *Plaintiff Asserts That He Is Unable To Perform Any Sort Of Work*

Plaintiff asserts that by July 1998, or three years after the diagnosis of diabetes, his

symptoms became so bad that he could continue to work only through the grace of his employer.
Williams maintains that during this time his diabetes caused his eyesight to worsen and caused
fluctuations in blood sugar.  These fluctuations, in turn, resulted in mood swings and a lack of
concentration and coordination.  *Record* at 68.  He contends that despite his worsening condition,
his employer allowed Plaintiff to miss work[1] and evidently allowed him to switch his position from
welder to crane operator.  *See id.* at 68 -70, 128, 178.

In his applications and testimony, and letters from his representative, Plaintiff also
describes a deteriorating condition that he contends rendered him incapable of any type of work in
a "structured environment" from July 1998 forward.  *See e.g., id.* at 141, 178.  He asserts that
because of the diabetes:  he is constantly and severely fatigued; his arms, chest, and legs tingle; he
suffers from constant severe pain in his legs and feet and, therefore, cannot sit for long periods;
his eyes burn and hurt and have lost vision capacity; he suffers from severe headaches and loss of
memory and the ability to concentrate; and he is constantly "severely" depressed.  *See id.* at 102,
103, 128, 140, 146, 152; 171-73, 178-82.

Plaintiff attributes a number of his symptoms to an inability to regulate his blood sugar and
physical exertion.  *Id.* at 152; *see also id.* at 172 ("severe fluctuation in sugar levels will cause
nervousness, irritability, extreme mood swings, these symptoms tend to cause a lot of fear, Buddy
becomes severely depressed."); *but see id.* at 153 (medicine "helps to level out sugars but length
of time varies").  The headaches, however, are caused by his poor vision when he reads for too

---

[1]  I note that Plaintiff's earning statement does not appear to support this contention.  Plaintiff's
earnings did decrease slightly from 1994 to 1995.  However they continually increased in 1996 and 1997.
The decrease in 1998 is reflective of the fact that Plaintiff only worked part of the year.  *See Record* at
118.

long a period.  *Id.* at 154, 162, 173.  Plaintiff also complained of gaining thirty pounds "since becoming insulin dependent," *id.* at 154, but that was after he lost a great deal of weight upon being diagnosed with diabetes, *see id.* at 69.

Plaintiff complains of trouble sleeping through the night because his "kidneys" wake him "constantly"and he generally has to urinate frequently.  *Id.* at 158, 172.  He claims that "almost anything" upsets him and with his family[2] he has extreme mood swings, his temper flares and he argues.  But, his submissions are somewhat inconsistent on this point.  In one submission, he asserts that he becomes aggravated, frustrated and confused if his daily routine changes or he is stressed or someone criticizes him.  *See id.* at 144, 145, 156-57.  In yet another, Plaintiff maintains that most changes in daily routine "don't affect [him] much," *id.* at 156,  and when someone criticizes or tells him what to do "it doesn't really bother [him]," *id.* at 157.

Except for one notation that he frequently needs help buttoning his shirts, *id.* at 148, uniformly Plaintiff asserted that he has no trouble performing his personal needs, *see id.* at 153, 159, 155-56 (specifically bathing, brushing teeth, fixing hair, shaving, selecting appropriate clothing, cooking, paying bills, visiting, shopping/making change, riding the bus, taking care of children).  He cooks breakfast and does some light house cleaning (such as washing dishes and laundry), walks 45 minutes daily, watches television, listens to the radio, and does light yardwork (mowing the lawn, caring for a cow).  Although Williams can drive, he rarely does so because sitting for long periods hurts him and because he is prone to road rage.  He has no recreational activities and no social contacts whatsoever.  He no longer hunts or fishes is because he has "no patience" and is "afraid to be alone in the woods or on lake or river."  *Id.* at 72-73, 77-78 131,

---

[2]  Plaintiff subsequently divorced.

4

153, 158, 161, 163, 167, 173, 180.

### B. *Treating Physician For Diabetes (Dorfman) Is Of Opinion Plaintiff Can Work*

The circumstances under which Plaintiff was diagnosed with diabetes are not entirely clear from the record. Evidently he visited the Internal Medicine Center in Paris, Texas, at some unspecified date, complaining of wheezing and asthma symptoms. Dr. Gordon B. Strom is associated with that clinic and believes Plaintiff was diagnosed with diabetes at that time. However, Dr. Steven Dorfman, who is associated with the Endocrine Associates of Dallas, actually rendered the medical care for Plaintiff's diabetic condition. *See id.* at 191, 258.

Dr. Dorfman's records begin as of January 1996. From 1996 to July 1998, Plaintiff's diabetes was "well" to "reasonably" controlled on oral medication, even when Plaintiff took the medication improperly. He was maintaining the weight he gained back after an initial drop when the diabetes was diagnosed.[3] None of Dr. Dorfman's records or labwork mention the problems

---

[3] *See Record* at 192 (1/10/96 – weight 169 pounds in boots; "By some interpretation error on his part, instead of taking the metformin 500 mg b.i.d as well as the Glucotrol, he stopped the Glucotrol. Yet, his sugars look quite perfect"); *id.* at 190 (4/3/96 – weight not noted; Plaintiff's "fasting sugars are a little too high" so medication increased); *id.* at 188 (9/18/96 – weight not noted; Plaintiff "clinically seems to be doing well with his sugars. His diabetes is under very good control."); *id.* (2/26/97 – weight 164 pounds; Plaintiff's "diabetes sounds like it is well controlled. . . . Since he is a welder, we do not want to keep his diabetes over tightly controlled since this would be some potential risk if he had a hypo-glycemic reaction at work because he is working with somewhat dangerous equipment."); *id.* at 187 (5/22/97 – weight 163 pounds; Plaintiff "seems to be doing quite well. He has only been taking his Glucotrol XL once a day and his Glucophage two tablets twice a day. We will see if he needs to increase the Glucotrol to twice a day [notation 'yes']. Sugars sound reasonable however, with diet and exercise and the above medications."); *id.* at 186 (8/20/97 – weight 162 pounds; something is "apparently much more tightly controlled at home now and it probably exists that this is the right dose of medication for him. However, we will see if we can back off anyway on his medication depending upon his sugars and hemoglobin"); *id.* (12/4/97 – weight 164 pounds; same medications in same dosage); *id.* at 185 (3/4/98 – weight 164 pounds; on "maximal doses" of oral medication for diabetes, Plaintiff's blood sugars are "reasonably controlled"); *id.* at 185, 237 (4/2/98 – weight 161 pounds; same medications in same dosage "with pretty reasonable control of his sugars. I am really expecting his glyco hemoglobin to be much better. . . . I suppose he has lost weight from 164 to 161 pounds; not so much from his sugar standpoint, but probably just from being stressed and not eating well and being anxious [due to impending shut down of plant]"); *id.* at 237 (7/1/98 – weight not noted; "Buddy

and/or limitations that Plaintiff asserts. *See id.* at 185-223, 234-37. Neither do the records of his other treating physician at the time. *See id.* at 224-25.

To the contrary, in the first half of 1996, Plaintiff asked Dr. Dorfman to inform his employer that he had diabetes, evidently because he was trying to persuade his employer to move him to the day shift. Dr. Dorfman, however, was of the opinion that Plaintiff's diabetes was not a "medically necessary" reason to justify the switch in shifts and Plaintiff became "resigned" to remaining on the night shift.[4] Several months before the plant closed, Plaintiff became worried about finding another job and Dr. Dorfman prescribed sleeping pills. Although Plaintiff was concerned that he would have "a lot of difficulty" finding another job, *id.* at 185, Dr. Dorfman was of the opinion that "as long as [Plaintiff's] diabetes is reasonably controlled . . . he will be able to work," *id.* at 237.

After two years of reasonable control of his blood sugars, by September 1998, Plaintiff's control of his blood sugar was worsening and he was unable to find work. Dr. Dorfman discontinued the oral medication and prescribed insulin shots instead.[5] On October 1, 1998,

---

Williams' sugars sound reasonable.").

[4] *See Record* at 190 (5/6/96 – "Pt's wife called – wants note fax to [telephone number] Babcock & Wilcox Co. saying husband had diabetes. Faxed per Dr. Dorfman."); *id.* at 191 (copy of the fax on Dorfman letterhead/prescription pad dated 5/6/96 stating only "Buddy Williams . . . Patient has diabetes mellitus."); *id.* at 189 (7/30/96 – Dr. Dorfman "[r]eceived call from pt's employer, Boyd Rosser to inform us that in order for the pt to be transferred to the day shift, he must have a letter stating it is a 'medical necessity.' Place of employment is unionized & pt does not have the seniority to be transferred unless it is a medical necessity. Attempted to call pt to inform him working the day shift is not considered a medical necessity per Dr. Dorfman's orders. No answer. Will attempt to contact pt tomorrow.") (emphasis original); *id.* (7/31/96 – Dr. Dorfman's office "Spoke [with] pt's wife. She states she and pt understand Dr. Dorfman has done all he can to help pt get onto day shift. Pt. resigned to working 2nd shift.").

[5] *Record* at 236 (9/16/98 – weight 172 pounds; "Buddy Williams seems to be slowly progressing to needing insulin in the sense that his nocturia is increasing to three to four times a night. His sugars are running about 200 at all times. His last glyco hemoglobin was 8.1% and three to six months was 7.2%.

Plaintiff filed his application for benefits. *Id.* at 113. Dr. Dorfman continued to see Plaintiff through the end of 1998, during which time Plaintiff was gaining weight and Dr. Dorfman was adjusting Plaintiff's insulin regimen to deal with hypoglycemic reactions.[6]

The record does not show that Dr. Dorfman or any other physician treated Plaintiff for diabetes after December 1998. The record does not show that Plaintiff received any medical care for his depression at any time. Rather, the only other records are those of examining and/or consulting physicians, who evaluated Plaintiff in early 1999, after the initial denial of benefits on November 19, 1998. *See id.* at 88, 226-33 (initial denial).

### C. *Examining Consulting Psychiatrist For Mental Impairment (Lee) Is Of The Opinion Plaintiff Could Not Work At Time Of Examination But Could Respond To Therapy*

Doctor Paul M. Lee performed the first examination. His report is not written on

---

His progression is clearly to failing on oral agents."); *id*. at 235 (9/30/98 – "Pt. sugars still too high PM. Pt states vision fuzzy. Pt. to take 15 units AM & 12 PM & call or fax if blood sugars do not come down to normal. Pt. taking shots okay. Pt needs supplies called in. Pt. was traveling & eating on the road. Pt. states he was unable to find a job. Pt. stopped taking the Restoril, he didn't want to get addicted.").

[6] *Record* at 235 (10/15/98 – weight 178 pounds though Plaintiff walks daily; "His sugars are under much better control although is fasting sugars could be a little bit better controlled. We will go up to 15 and 13 from 15 and 12 and see him back in six weeks or so. We will do a hemoglobin $A_{1c}$ at that time. We would like to keep his hemoglobin $A_{1c}$ around the 7% range which I think would be reasonable in this setting. I am confident, looking at his sugars, that we certainly are accomplishing that, which is about a mean sugar of 150. He is going to record his sugars a little more compulsively before lunch and bedtime so that we can get all those four readings at least for the week that he comes to see me."); id. at 234 (10/27/98 – "Pt changing insurance. Pt. insulin dose [medical symbol? or strike-out?] splits. Pt. sugars going to low in the afternoon. Pt. demonstrated how to mix dose. Pt instructed on peaks of insulin PE to fax blood sugars in 2-3 days. Pt. will have new insurance in 3 months. Pt. to call for appt. then."); *id.* (12/23/98 – weight 195 pounds; "Buddy Williams is having some hypoglycemic reactions during the day, particularly at lunchtime. Also, having some hypoglycemia early in the evening, sometimes at bedtime or 2:00 o'clock in the morning. . . . We are going to move his NPH from dinnertime to bedtime and lower his NPH and sliding scale in the morning; lower his NPH from 10 to 9 and lower his sliding scale 1 to 2 units in the morning and see if this corrects the problem. If we need to we will even lower his sliding scale another unit each time in the morning. He has gained a lot of weight and I think part of this is probably eating to avoid hypoglycemia.").

letterhead, nor does his resume appear in the record, so Dr. Lee's specialty is unclear.  Plaintiff

refers to him as a psychiatrist, *see Doc. 14* at 6, and Defendant does not dispute the assertion, so I

will assume he is a psychiatrist.  Dr. Lee noted that Plaintiff's "chief complaint" was that he was

"'having problems with [his] memory'" and characterized Plaintiff's diabetes as "quite brittle . . .

200 to 300 on his blood sugar range." *Id.* at 254.  Dr. Lee's mental status examination revealed

that Plaintiff "was clearly psychomotor retarded," with his cognition and thought processes

"sluggish" and poor math and spelling skills, but he performed "quite well" on construction tasks,

reading, and following instructions.  *Id.* at 255.

Dr. Lee's report concludes that as of January 1999, Plaintiff was suffering from

depression, *id.* at 255, and although he can care for himself, *id.* at 255-56, he

> has a very limited capacity for coping with stressors.  He does not
> appear to be able to handle the stress of a work situation at this
> point.  Concentration is very limited due to his severe depression.
> Deterioration has been marked given [h]is level of function some
> years back.

*Id.* at 256.  He diagnosed Plaintiff with "[m]ajor depressive disorder single episode severe with

associated pseudodementia," "[g]eneralized anxiety disorder," and was of the opinion that

Plaintiff's "[u]nemployment, chronic medical illness, social isolation" were severe, thus resulting

in a global assessment of functioning or "GAF" of 50.[7]  Dr. Lee issued a "guarded prognosis,"

saying that

> It is encouraging that [Plaintiff] has not received any psychiatric
> treatment.  Thus it would be difficult to determine what type of

---

[7]  "The GAF rates the client's "psychological, social, and occupational functioning. . . ." *See*
American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders at 30 (4th ed. 1994).
Of particular note, ***"[t]he GAF is not an absolute determiner of ability to work."*** *Stalvey v. Apfel,* 242
F.3d 390 at *2 (10th Cir. 1999) (unpublished) (emphasis added).

> response he might have to that treatment.  If this dementia should
> prove to be related to another condition other than his depression,
> it might alter his prognosis significantly and provide for a much
> worse long term prognosis.  If this indeed does represent a
> pseudodementia secondary to major depression, which I suspect it
> does, there are any number of a wide range of therapeutic
> interventions that can be performed with varying levels of
> prognosis.  At any rate at this point, currently, the patient could not
> tolerate the stress of work.

*Id.* at 257.

Dr. Lee's report refers to a completed "Form TRC-886," *id.* at 257, which does not appear in the record.  Instead, nonexamining consulting physician Dr. Lyman G. Phillips executed "Psychiatric Review Technique ("PRT")" and "Mental Residual Functional Capacity Assessment" ("RFC") forms.  Based on the major depression and anxiety disorders diagnosed by Dr. Lee, *see id.* at 275, Dr. Phillips concluded that Plaintiff:  has "slight" limitations in social functioning; is "often" limited in concentration/persistence/pace, *id.* at 271; and is "moderately limited" in his ability to remember locations and work-like procedures, to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete normal work day or week without interruptions and at a consistent pace, to accept instructions and respond appropriately to criticism form supervisors, and to respond appropriately to changes in a workplace setting, *id.* at 273-74.  Otherwise, Dr. Phillips found Plaintiff not significantly limited in any other category.  *Id.*  The "functional capacity assessment" notes that Plaintiff has no history of psychiatric treatment and "shows mild impairment of concentration.  Alleged limitations are not totally supported by evidence in file."  *Id.* at 275.

### D.  Examining Consulting Physician For Physical Impairment (Strom) Is Of Opinion Plaintiff Can Do Sedentary Work

Dr. Strom, who did not treat Plaintiff for diabetes, also performed a consultative examination of Plaintiff and did so in February 1999.  His findings are consistent with a conclusion that Plaintiff can do sedentary work with glasses:

> [Plaintiff] does not have any significant inability to sit, stand, move about or carry objects.  .  .  .  He could fully move both hands.  He did not have evidence of gross dysfunction or loss of dextrous movements.  He could ambulate without the use of assistive devices.  His vision is poor without glasses and there was no evidence of venous insufficiently noted.

*Id.* at 260.  Dr. Strom's recommendation states that Plaintiff "has a major complaint, depression, which I suspect is a significant portion of his disability.  ***He lists problems with his legs and eyes and there is really not significant deficit present.***  I am concerned that this patient is significantly depressed as an etiology for the majority of his symptoms and would benefit from aggressive management of his depression."  *Id.* at 261 (emphasis added).

Nonexamining consulting physician Dr. William O. Cleland executed a "Physical Residual Functional Capacity Assessment" form and concluded Plaintiff can occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and has unlimited push/pull capacity.  *Id.* at 278.  He noted also that the "alleged limitations caused by the claimants symptoms are not (or are not fully) supported by the medical and other evidence."  *Id.* at 282.

### E.  Post-Reconsideration Denial Developments

In March, 1999, the Administration denied Plaintiff's request for reconsideration of the initial denial of benefits.  *Id.* at 89.  In July 1999, Plaintiff had Dr. Strom fill out what look to be xeroxed portions of old or different forms that mirror some of the areas of inquiry on the PRT and

10

RFC forms for mental impairments.  On the PRT-type "form," Dr. Strom reached some of the same conclusions as Dr. Phillips.  That is, Dr. Strom was of the opinion that Plaintiff has moderate limitations in:  ability to understand/remember/carry out detailed instructions, and in working with others without being distracted.  *Id.* at 290.  In contrast to Dr. Phillips, Dr. Strom concluded Plaintiff also has moderate limitations in daily living and social functioning and has had "repeated" episodes of deterioration or decompensation in the work setting.  *Id.* at 289.

Nevertheless, Dr. Strom's conclusions on his RFC-type "form" are consistent with the ability of Plaintiff to perform unskilled work.  For example, he found that Plaintiff is "not significantly limited" in his ability to "understand, and remember very short and simple instructions," "maintain attention and concentration for extended periods," perform on a schedule with regular attendance and punctuality, "sustain an ordinary routine without special supervision," or "make simple work-related decisions."  *Id.* at 290.  He found "no evidence of limitation" in Plaintiff's ability to 'remember locations an work-like procedures" or "carry out very short and simple instructions."  *Id.*

In October 1999, Plaintiff underwent cataract surgery, which helped his vision.  *Id.* at 291-95.  In November, Dr. Strom sent a letter to Plaintiff noting that prior tests showed elevated cholesterol levels and furnished Plaintiff with a prescription for Zocor.  *Id.* at 296-97.

### III.  Analysis

#### A. Credibility & Related Issues

Plaintiff alleges that ALJ Evans erred in assessing his credibility and failed to give proper weight to certain medical evidence.  These issues are interrelated, almost inextricably so, and I thus consider them together.  As discussed in the next three sections, ALJ Evans applied the

correct legal standards.  Moreover, his credibility determination is based on substantial evidence.

### (1)  Prior Work History Is Not Conclusive Of Credibility

After considering the medical evidence of record, ALJ Evans began his discussion of

credibility by citing the factors to consider.  He introduced his analysis with this paragraph:

> The medical opinions and notes throughout the record weigh
> heavily against the claimant's allegations of a disability.  The
> allegations of symptom levels that preclude all types of work are
> not consistent with the evidence as a whole and are not credible.
> None of the physicians involved in the claimant's treatment
> provided objective findings which would indicate that the claimant
> was disabled or made any statement or recommendation that he
> would have been unable to work at a substantial gainful level for a
> continuous period of at least 12 months.

*Record* at 47.

One of the factors ALJ Evans considered in reaching his credibility determination was

Plaintiff's prior work record.  *Id.* at 47 (citing 20 C.F.R. 404.1529(c) and SSR 96-7); *see also*

*Bean v. Chater,* 77 F.3d 1210, 1213 (10th Cir. 1995).  In his analysis, he considered that Plaintiff

"has a fairly consistent work history," but assigned it no weight, finding that Plaintiff's "past work

record neither adds to nor subtracts from the claimant's credibility."  *Id.* at 48.  Plaintiff asserts

that a good work record entitles him to a finding that he is "more" or "substantially" credible.

*Doc. 14* at 10.

Plaintiff relies on a quotation from a Second Circuit decision that states:  "A claimant with

a good work record is entitled to substantial credibility when claiming an inability to work

because of a disability."  *Rivera v. Schweiker,* 717 F.2d 719, 725 (2nd Cir. 1993).  *Rivera,* in turn

relies on *Singletary v. Secretary of Health, Education and Welfare,* 623 F.2d 217 (2nd Cir. 1980),

which provided in relevant part:

> Mr. Singletary does show a life history of hard labor performed under demanding conditions over long hours. His work record shows employment by nationally known racing stables. These animals, both trotters and pacers, are very valuable. Their care is not entrusted to malingerers or goldbricks. **His prior work history justifies the inference** that when he stopped working he did so for the reasons testified to.

*Id.* at 219 (emphasis added). One decision in this circuit relied on *Rivera* when it stated that "[w]here a claimant has a good work history, she is entitled to substantial credibility when she then asserts that she is unable to work." *Tyson v. Apfel,* 107 F.Supp.2d 1267, 1270 (D. Colo. 2000).

I am not persuaded, however, that the *Rivera* statement is consistent with the multi-factor credibility analysis provided by the regulations and Tenth Circuit law. Reading *Rivera* in light of the *Singletary* decision upon which it relies, the Second Circuit gives claimants with a long work history a presumption of credibility or, at the very least, requires an ALJ to assign a high value to that individual factor. The Seventh Circuit has rejected that approach, and I believe the Tenth Circuit would do so as well.[8]

Under Tenth Circuit precedent, if the ALJ considers the requisite factors and links his or her credibility findings to substantial evidence in the record, then the credibility determination is entitled to deference and this Court cannot reweigh the evidence and substitute its opinion for that of the ALJ. Prior work history is but one of the factors, and is not conclusive on the issue of

---

[8]  *See Jones v. Apfel,* 2000 WL 1648137 *2 (7th Cir. 2000) (" The Second Circuit has clarified, however, that work history is merely one of several factors bearing on credibility. . . . Because multiple factors also guide the ALJ's credibility determination in the Seventh Circuit, . . . Jones is not entitled to a presumption of credibility based solely on his long work history.") (internal citations omitted).

credibility.[9]  I therefore reject Plaintiff's contention that he should have been considered credible solely on the basis of his long work history.  In considering prior work history as a factor, the ALJ applied the correct standard.

### (2)  Dr. Strom Is Not A "Treating" Physician And, Even If He Is, His Opinion On Plaintiff's Limitations Was Credited And Relied Upon By ALJ Evans

Plaintiff also argues that ALJ Evans did not properly apply the "treating physician rule" to Dr. Strom's single statement that Plaintiff has "a great deal of difficulty managing his insulin therapy and apparently has wide swings in his blood sugar." *Doc. 14* at 5.  Dr. Strom made this statement in his cover letter that accompanied the mental impairment forms he sent to Plaintiff's representative.  *See Record* at 285.  This argument is unavailing for several reasons.

First, Dr. Strom is not a "treating" physician.  Evidently, Plaintiff was seen once at Dr. Strom's clinic in 1995, but there are no medical treatment records whatsoever from Dr. Strom or his clinic in the file, nor is there any indication that Dr. Strom was following Dr. Dorfman's treatment of Plaintiff's diabetes in the capacity of a referring treating physician.  Plaintiff did not list Dr. Strom as a treating physician for his diabetes or depression on his disability report, or on his reconsideration report, or on any other initial form.  He only mentioned Dr. Strom in his

---

[9]  *See e.g.,* 20 C.F.R. § 404.1259(c)(3) ("We will consider all of the evidence presented, including information about your prior work record"); *id.,* § 404.1259(c)(4) ("we consider all of the available evidence described in paragraphs (c)(1) through (c)(3)"); *see also Campbell v. Barnhart,* 56 Fed. Appx. 438, 441 (10th Cir. 2003) ("The ALJ did not place undue emphasis on plaintiff's work history, but considered it as but one of several factors bearing on her credibility. The ALJ linked his determination of credibility to specific findings of facts in evidence which are fairly derived from the record. Credibility determinations are peculiarly the province of the finder of fact, and should not be upset when supported by substantial evidence.") (internal quotations and citation omitted); *Jaramillo v. Massanari,* 18 Fed. Appx. 776, 778 (10th Cir. 2001) ("While, as Mr. Jaramillo argues, the ALJ must consider his prior work history as one factor in making his credibility determination . . . that history does not outweigh the record evidence supporting the ALJ's conclusion that Mr. Jaramillo's pain testimony was not fully credible.") (internal citation omitted).

statement for a request for hearing, and then only as having prescribed medication for athlete's foot and Priviril, which the Physician's Desk Reference indicates is used for hypertension and as an alternative to other drugs for heart failure patients.  According to the request for rehearing form and Plaintiff's testimony, Dr. Strom's first of these medications was prescribed in June 1999 and the second in July 1999, in other words, after Dr. Strom examined Plaintiff as a consulting physician for the agency.  *See Record* at 68-69, 75, 129, 147, 168-69.

As the Tenth Circuit recently explained, the regulations and caselaw "require[] a relationship of both duration and frequency," and doctors are generally considered as "treating sources" when they have "seen the claimant 'a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment.'"  *Doyal v. Barnhart,* ___ F.3d ___, 2003 WL 21350254 at *4 (10th Cir. 6/10/03).

> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source.  Absent an indication that an examining physician presented 'the *only* medical evidence submitted pertaining to the relevant time period,' the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion.

*Id.* (citing *Reid v. Chater,* 71 F.3d 372, 374 (10th Cir. 1995), and adding emphasis).  In Plaintiff's case, the medical evidence concerning his diabetes and control thereof are provided by Dr. Dorfman's medical records.  In the absence of any treatment records or an indication by Dr. Strom of a treatment relationship of some standing, I conclude that he cannot be considered a "treating" physician.

Alternatively, I will assume for the purposes of discussion that Dr. Strom is considered a

treating physician.  If I understand Plaintiff's position correctly, he contends that Dr. Strom's statement that Williams "has had a great deal of difficulty managing his insulin therapy" should be considered an objective finding that he is disabled by his "wide swings in his blood sugar."  *See Doc. 14* at 5.  Williams argues that such a finding corroborates his testimony.

I disagree that the cited statement is an "objective finding."  Since there are no treating records from Dr. Strom, I conclude that the isolated sentence in question reflects Dr. Strom relating something Plaintiff had told him, as opposed to something he observed during the course of treatment.  Thus, ALJ Evans correctly characterized the record when he found that no treating physician made objective medical findings indicating that Plaintiff is disabled or unable to work. Furthermore, Plaintiff's assertion that ALJ Evans failed to "discuss which objective findings contradict [Plaintiff's] allegation that his diabetes, depression and weakness disable him," *Doc. 14* at 6, simply does not bear scrutiny in light of ALJ Evans' discussion of Plaintiff's allegations of limitations compared to the findings Dr. Strom made.  *See Record* at 48-49.

Also, Dr. Strom's statement does not clearly state that Plaintiff's diabetes, *i.e.,* the disease itself, is uncontrollable with medication.  Rather, on its face it plainly suggests that Plaintiff does not properly manage his insulin.  Even if I assume that Dr. Strom's comment means Plaintiff's disease is poorly controlled, the statement says nothing about Plaintiff's ability to work despite his disease.  In fact, Dr. Strom rendered an opinion on that subject by virtue of the forms he provided, and ALJ Evans credited those opinions "significantly" in arriving at his decision.  Those opinions support the conclusion that Plaintiff can perform unskilled sedentary work given his diabetes and depression.  In the final analysis, then, ALJ Evans essentially did give controlling weight to Dr. Strom's opinion on Plaintiff's limitations.

16

In the alternative, then, I find that the treating physician rule is either not implicated or was in fact honored by ALJ Evans.

### (3)  ALJ Evans Did Not Deny Benefits Based On A Failure To Seek Treatment And He Rejected Dr. Lee's Opinion That Plaintiff Cannot Work Based On Substantial Evidence

Plaintiff contends that ALJ Evans entirely discounted Plaintiff's depression on the improper ground that Plaintiff failed to seek treatment, without applying the four-part inquiry required by *Thompson v. Sullivan,* 987 F.3d 1482, 1490 (10th Cir. 1993).  *Doc. 14* at 7-8.  He further contends that in discussing Plaintiff's failure to seek counseling, ALJ Evans "displays a lack of understanding of those who suffer from mental illness" and constitutes a error of law, because those "with mental impairments may not be able to recognize the need to seek treatment." *Id.* at 7.  I disagree.

Plaintiff's reliance on *Thompson* is misplaced because the ALJ did not deny benefits based on a failure to seek treatment.  The extent to which Plaintiff sought treatment for what he characterizes as debilitating depression is a legitimate "avenue of inquiry" in the credibility context.  *Teets v. Apfel,* 1997 WL 713248 n.2 (10th Cir. 1997) (attached); *see also Brown v. Barnhart,* 47 Fed. Appx. 864, 866 (106th Cir. 2002) (credibility determination did not violate *Thompson* where claimant's failure to lose weight was among the factors the ALJ considered in making credibility determination); *Allen v. Apfel,* 2000 WL 796081 (10th Cir. 2000) (and reported cases cited therein; rejecting argument that consideration of failure to take pain medication violated decisions *Thompson* relied upon) (attached); 20 C.F.R. § 404.1530(b) (the four factor test for denial of benefits when claimant fails to pursue prescribed medical treatment without good reason).  Also, it is not erroneous when an ALJ considers a claimant's subjective complaints of

depression and rejects them because they are inconsistent with the medical assessments of the claimant's condition and degree of functional limitations. *See Allen, supra.*

In any event, ALJ Evans did not entirely discount depression as an impairment. To the contrary, he found it to be "severe" at step 2. *Record* at 46. At issue here is not whether Plaintiff suffers from depression, but rather the degree of limitations posed by that condition. Plaintiff maintains the limitations render him unable to do any work. As to the latter issue, ALJ Evans found:

> The claimant also alleges that he is disabled due to depression. Although the claimant testified that he has problems with mood swings, the claimant also testified that he has receive no treatment for this condition. Dr. Lee noted that the claimant interacted appropriately; his memory was intact; he was able to attend; and he had a low level of clinical depression. However, Dr. Lee also noted that his concentration was impaired. (Exh. 7F) Although the claimant may have some depression, the claimant's lack of treatment weight heavily against his allegations of disabling symptoms.

*Record* at 48.

Plaintiff argues ALJ Evans simply ignored Dr. Lee's opinion that he cannot work. He maintains that Dr. Lee's opinion "when added to the opinion of Dr. Strom, makes [his] claim that he cannot work a compelling one." *Doc. 14* at 7. Again, ALJ Evans did not ignore Dr. Lee's opinion that Plaintiff cannot work. To the contrary, he specifically discussed that finding. *Record* at 47. The quotation above demonstrates that Dr. Lee's specific findings are not necessarily consistent with his assertion that Plaintiff cannot work. Moreover, ALJ Evans thoroughly reviewed the medical evidence and specifically relied upon the mental limitation assessments of Dr. Strom, which were essentially consistent with Dr. Lee's, and specifically relied upon the

consulting physicians' mental limitations assessments, which support Dr. Strom's findings.  He additionally rejected Plaintiff's claims of total disability in light of his considerable daily activities. It is quite clear upon reading the comprehensive opinion that the reason ALJ Evans rejected Dr. Lee's conclusory statement about ability to work is because of other substantial evidence in the record.

### B. ALJ Properly Relied On Vocational Expert Testimony

Plaintiff argues it was error for the ALJ not to adopt the vocational expert's testimony, asked by his representative, that a residual functional capacity which includes problems with mood swings and depression precludes all jobs.  *See Doc. 14* at 9; *Record* at 84-86.  However, it is well settled that an ALJ is not required to accept as binding a hypothetical based on evidence unsupported by the record:

> [t]he hypothetical question should include all – and only – those impairments borne out by the evidentiary record. . . . The VE relied on the limitations found by the ALJ, which are reflected in the RFC assessment form. The ALJ was not required to accept the answer to a hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record.  . . .  We conclude the ALJ did not err in relying on the VE's testimony.

*Bean v. Chater,* 77 F.3d 1210, 1214 (10th Cir. 1995); *see also Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996); *Talley v. Sullivan,* 908 F.2d 585, 588 (10th Cir. 1990).  This argument without merit in light of the credibility discussion, above.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 13)* is DENIED and the decision of the Commissioner is AFFIRMED.  A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

19

131 F.3d 152 (Table)
97 CJ C.A.R. 2924
**Unpublished Disposition**
**(Cite as: 131 F.3d 152, 1997 WL 713248 (10th Cir.(Okla.)))**

NOTICE:   THIS IS AN UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA10 Rule 36.3
for rules regarding the citation of unpublished
opinions.)

United States Court of Appeals, Tenth Circuit.

Ricky D. TEETS, Plaintiff-Appellant,
v.
Kenneth S. APFEL, Commissioner, Social
Security Administration, [FN*]
Defendant-Appellee.

FN* Pursuant to Fed. R.App. P. 43(c),
Kenneth S. Apfel is substituted for Shirley
S. Chater, former Commissioner of the
Social Security Administration, as the
defendant-appellee in this action.

No. 97-5031.
(D.C.No. 95-CV-791)
Nov. 17, 1997.

Before KELLY, McKAY, and BRISCOE, Circuit
Judges.

ORDER AND JUDGMENT [FN**]

FN** This order and judgment is not
binding precedent, except under the
doctrines of law of the case, res judicata,
and collateral estoppel. The court
generally disfavors the citation of orders
and judgments; nevertheless, an order and

judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

**1 After examining the briefs and appellate
record, this panel has determined unanimously to
grant the parties' request for a decision on the
briefs without oral argument. See Fed. R.App. P.
34(f); 10th Cir. R. 34.1.9. The case is therefore
ordered submitted without oral argument.

 Plaintiff appeals from an order of the magistrate
judge [FN1] affirming the denial of social security
disability insurance and supplemental security
income benefits. After determining that, despite
severe diabetes mellitus with cataracts, ocular
hemorrhages, and early renal failure, plaintiff
retained the residual functional capacity to perform
light work not requiring fine vision, the
administrative law judge concluded that plaintiff
could perform several jobs identified by a
vocational expert and, thus, found him not disabled
at step five of the controlling sequential analysis.
See generally Williams v. Bowen, 844 F.2d 748,
750-52 (10th Cir.1988). We review this decision
to determine whether the operative findings rest on
substantial evidence and correct legal standards
were applied. See Castellano v. Secretary of
Health & Human Servs., 26 F.3d 1027, 1028 (10th
Cir.1994). Plaintiff contends the ALJ failed to
consider, and include in the dispositive hypothetical
inquiry to the vocational expert, significant
nonexertional impairments associated with his
condition. We agree and, accordingly, reverse and
remand for further administrative proceedings.

FN1. Pursuant to 28 U.S.C. § 636(c)(1),
the parties consented to proceed before the
magistrate judge. Accordingly, our
jurisdiction arises under § 636(c)(3) and
28 U.S.C. § 1291.

 Plaintiff's diabetes is only poorly controlled
through medication. This fact is reflected by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

numerous hospitalizations and end organ damage, and expressly confirmed by plaintiff's treating physician. *See* Appellant's App. at 287, 288. Plaintiff explained the practical, everyday consequences of this instability at the hearing, where he described frequent episodes of weakness, disorientation, dizziness, vomiting, dehydration, etc., caused by aberrant blood sugar levels. *See id.* at 48-51, 53-54, 61-62. His testimony is supported by the medical record, *see, e.g., id.* at 319 (noting "multiple admissions for complications of diabetes," including "recurrent history of nausea, vomiting, hematemesis, and … gastroenteropathy"), and buttressed by plaintiff's history of sporadic, transitory employment repeatedly lost due to illness-related unreliability and absence, *see id.* at 37-38, 42-44, 135. His treating physician and his vocational rehabilitation counselor agree he is not employable. *See id.* at 287, 420.

Focusing instead on plaintiff's visual impairment, the ALJ overlooked this critical dimension of plaintiff's disease. As a result, he gave no reasons for rejecting the treating physician's opinion, which he never acknowledged. This alone is serious error. *See Goatcher v. United States Dep't of Health & Human Servs.,* 52 F.3d 288, 289-90 & n. 2 (10th Cir.1995) (failure to "give specific, legitimate reasons for disregarding the treating physician's opinion" held "a miscarriage of justice" warranting reversal); *see also Miller v. Chater,* 99 F.3d 972, 976 (10th Cir.1996). The ALJ also ignored plaintiff's testimony regarding the adverse effect of his uncontrolled diabetes on basic activities. The catch-all, conclusory statement that "claimant's complaints are not consistent with the medical evidence nor the record as a whole," Appellant's App. at 21, is a plainly inadequate basis for discrediting plaintiff's testimony. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995) ("[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.") (quotation omitted). Indeed, this testimony appears, rather, to be corroborated by the medical record, the treating physician's findings, plaintiff's work history, and the judgment of his vocational counselor.

**\*\*2** The significance of these errors is evident from the vocational expert's testimony. In response to the ALJ's initial hypothetical inquiry, which omitted any reference to problems associated with plaintiff's poorly controlled condition, the expert identified several potential occupations. *See* Appellant's App. at 66-68. But, when the hypothetical was augmented with a reference to such problems, the expert identified plaintiff was unemployable. *See id.* at 68-70. As only an answer to an accurate and complete inquiry controls, the expert's testimony cannot, at least at this point, substantiate a finding of nondisability. *See Evans v. Chater,* 55 F.3d 530, 532 (10th Cir.1995).

The analytical errors noted herein are predominately those of omission. We cannot rule out the possibility that a finding of nondisability could properly be made, perhaps on the basis of additional evidence. [FN2] And, in any event, given the progressive nature of plaintiff's disease, a particular disability onset date is not immediately evident. This is especially significant with respect to the matter of disability insurance benefits, for which plaintiff's eligibility ceased after June 1986. In light of such uncertainties, we deem a remand for further proceedings appropriate. *Cf. Evans,* 55 F.3d at 532.

FN2. The ALJ chided plaintiff at one point for being "repeatedly noncompliant with diet, exercise, and medication," Appellant's App. at 18, but then never returned to the matter. While, as it stands, this incidental criticism would be grossly deficient--substantively and procedurally--as a basis for denying benefits under the rubric of "failure to follow prescribed treatment," *see* Social Security Ruling 82-59, 1982 WL 31384; *see, e.g., Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993); *Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir.1985), it suggests a legitimate avenue of inquiry on remand.

The judgment of the United States Magistrate

Judge is REVERSED and the cause is REMANDED with instructions to remand, in turn, to the Commissioner for further proceedings consistent with this order and judgment.

131 F.3d 152 (Table), 1997 WL 713248 (10th Cir.(Okla.)), 97 CJ C.A.R. 2924 Unpublished Disposition

END OF DOCUMENT

216 F.3d 1086 (Table)
2000 CJ C.A.R. 3611
**Unpublished Disposition**
**(Cite as: 216 F.3d 1086, 2000 WL 796081**
**(10th Cir.(Kan.)))**

H

NOTICE:    THIS IS AN    UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA10 Rule 36.3
for rules regarding the citation of unpublished
opinions.)

United States Court of Appeals, Tenth Circuit.

Jannett S. ALLEN, Plaintiff-Appellant,
v.
Kenneth S. APFEL, Commissioner of Social
Security Administration, Defendant-
Appellee.

**No. 99-3249.**

June 21, 2000.

Before TACHA, EBEL, and BRISCOE, Circuit
Judges.

ORDER AND JUDGMENT  [FN*]

FN* This order and judgment is not
binding precedent, except under the
doctrines of law of the case, res judicata,
and collateral estoppel. The court
generally disfavors the citation of orders
and judgments; nevertheless, an order and
judgment may be cited under the terms and
conditions of 10th Cir.R. 36.3.

EBEL.

**1** After examining the briefs and appellate
record, this panel has determined unanimously to
grant the parties' request for a decision on the
briefs without oral argument. See Fed.R.App.P.
34(f); 10th Cir.R. 34.1(G). The case is therefore
ordered submitted without oral argument.

Plaintiff Jannett S. Allen appeals from the denial
of social security disability benefits. We have
jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C.
§ 405(g). We review the Commissioner's decision
on the whole record to determine only whether the
factual findings are supported by substantial
evidence and the correct legal standards were
applied. See Qualls v. Apfel, 206 F.3d 1368, 1371
(10th Cir.2000). We may not reweigh the evidence
or substitute our judgment for that of the
Commissioner. See id.

The facts and a detailed description of the entire
administrative record are well stated in the district
court's opinion, see Allen v. Apfel, 54 F.Supp.2d
1056 (D.Kan.1999), and we need not restate them
here in detail. Suffice it to say that plaintiff, who
was born in 1951, filed a claim for disability
benefits on June 27, 1995, alleging that she has
been disabled since May 30, 1995, due to heel
spurs and "broken" vertebras, which she claimed
prevented her from walking or standing more than
fours hours at a time. Her claim was denied
initially and upon reconsideration.

After a hearing before an administrative law judge
(ALJ), the ALJ determined that plaintiff could not
return to her past relevant work as a
groundskeeper, waitress, or construction worker,
but that she retained the residual functional
capacity (RFC) to perform work which permitted
her to alternate between sitting and standing at will,
and which did not require her to lift two to three
pounds more than frequently or to ever lift more
than ten pounds. Based on the testimony of a
vocational expert (VE), the ALJ determined that
plaintiff had the RFC to perform the jobs of
cashier, information clerk, food tabulator and
security monitor, and that these jobs existed in
significant numbers in the local and national
economies. The ALJ therefore determined that
plaintiff was not disabled and denied benefits at
step five of the evaluation sequence. See Williams

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*v. Bowen,* 844 F.2d 748, 750-52 (10th Cir.1988). The Appeals Council affirmed the ALJ's decision, making it the Commissioner's final decision. Plaintiff then filed suit in district court, which affirmed the Commissioner's determination. *See Allen,* 54 F.Supp.2d at 1056.

On appeal, plaintiff claims that the ALJ (1) did not correctly assess her RFC; (2) failed to evaluate properly her complaints of disabling pain; (3) made credibility findings which are not supported by substantial evidence; and (4) posed a hypothetical question to the VE that did not include all of her impairments.

I. RFC Assessment

Plaintiff first challenges the ALJ's RFC assessment on the ground that the ALJ ignored plaintiff's testimony that she needed to alternate sitting and standing and to lie down and elevate her feet due to fatigue, pain and swelling. *See* Appellant's Br. at 14. In fact, the ALJ's RFC determination did find that, because of her heel and back pain, plaintiff needed to alternate between sitting and standing at will. *See* Appellant's App. at 18 and 240. [FN2] With respect to her claimed need to elevate her feet, plaintiff did not report this asserted limitation to any physician, nor does the record contain any medical treatment for this alleged condition. Plaintiff did not include this limitation in her original disability report, nor does this asserted limitation appear consistent with her daily living activities report. The ALJ's RFC determination flows from his assessment of plaintiff's impairments, the medical evidence in the record, and plaintiff's daily living activity report. We find the RFC determination is supported by substantial evidence in the record.

FN2. Plaintiff argues for the first time in her response brief that the ALJ's hypothetical to the VE was flawed because it asked the VE to assume that plaintiff had to avoid prolonged sitting and standing, whereas the ALJ's RFC assessment states that plaintiff needs to alternate between sitting and standing at will. This court does not ordinarily review

issues raised for the first time in a reply brief. *See* Stump v. Gates, 211 F.3d 527, 533 (10th Cir.2000).

II. Pain Evaluation

**2** Plaintiff next contends that the ALJ failed to follow the dictates of *Luna v. Bowen,* 834 F.2d 161, 163-66 (10th Cir.1987) and improperly discounted her complaints of disabling pain. To qualify as disabling, pain must be severe enough to preclude any substantially gainful employment. *See Brown v. Bowen,* 801 F.2d 361, 362-63 (10th Cir.1986). In evaluating a claim of disabling pain, the ALJ must consider (1) whether the medical evidence establishes a pain producing impairment; (2) if so, whether there is at least a loose nexus between the impairment and the claimant's subjective complaints of pain; and (3) if so, whether considering all of the evidence, both objective and subjective, the claimant's pain is disabling. *See Luna,* 834 F.2d at 163. Once it is determined that a claimant has an impairment capable of producing pain, the ALJ must then consider her subjective complaints of pain and decide whether they are credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995).

In this case, plaintiff has shown objective medical evidence of a "pain producing impairment," and a loose nexus between the impairment and her pain. However, the objective evidence does not establish disabling pain. Accordingly, the ALJ had to evaluate plaintiff's subjective pain testimony and the other pertinent evidence before him. At the hearing, plaintiff testified that her pain is so intense that she can only walk five feet, sit for twenty-two seconds and stand in one place for twenty seconds. *See* Appellant's App. at 226. The ALJ found that plaintiff's "statements as to her pain and limitations are not consistent with the evidence of record which would appear to document a far greater physical and mental capacity than she ... testified to." *Id.* at 17. In reaching his conclusion, the ALJ considered and discussed plaintiff's medical history, including the lack of objective medical evidence, the lack of any ongoing medical treatment for her pain, and the lack of medication for severe pain; her July 1995 daily living activity

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

report, in which she reported cooking all of her own meals and doing two hours of daily housecleaning without assistance; and her continued participation in a cosmetology class since January 1994.

Contrary to plaintiff's assertion, the ALJ did not ignore *Luna* and discount her pain allegations based solely on a lack of supporting objective medical evidence. The ALJ was entitled to consider that claimant had not sought medical treatment for pain since June 1995, at which time she complained of foot pain after four hours of standing, rather than twenty seconds as she claimed at the administrative hearing. "[T]he extensiveness of the attempts [medical or nonmedical] to obtain relief [and] the frequency of medical contacts" are relevant factors in evaluating the plaintiff's subjective pain complaints. *Kepler,* 68 F.3d at 391 (quotation omitted).

Plaintiff contends the ALJ erred in not discussing the side effects of the pain medication she was prescribed after her heel spur surgery, which she testified made her nauseated. The only indication in the record that she discussed side effects from pain medication with her doctors is a January 1995 treatment note stating that a full tablet of Dolobid was too strong a dosage for plaintiff, and recommending that she take only half a tablet. *See* Appellant's App. at 138. Subsequent medical notes indicate that plaintiff's foot problems had improved, that she was "doing nicely," and was "not taking any more of the Dolobid." *Id.* at 137. We conclude the ALJ's implicit rejection of her testimony was proper. *See Qualls,* 206 F.3d at 1372 (holding that *Kepler* does not require a formalistic factor-by-factor recitation of the evidence).

III. Credibility Determination

**\*\*3** Plaintiff also contends that, in assessing the credibility of her complaints of disabling pain, as well as her complaints of fatigue, depression and related memory and concentration problems, the ALJ's credibility findings are not supported by substantial evidence in the record. *See Kepler,* 68 F.3d at 391. Plaintiff first argues the ALJ erred by considering her attendance at cosmetology school and her efforts to find work. However, the ALJ relied on numerous factors in making his credibility determination, and the fact that claimant was able to attend cosmetology school and was looking for work were not the only factors he took into consideration in assessing her credibility. *See Gay v. Sullivan,* 986 F.2d 1336, 1339 (10th Cir.1993) (while not conclusive, such activities as school attendance may be considered, along with medical testimony, in determining the right of a claimant to disability benefits).

Plaintiff also contends the ALJ erred in considering as a factor in his credibility determination the fact that she has not been told by any doctor "that her medical conditions would prevent her from engaging in work activity." Appellant's App. at 17. She claims the ALJ erroneously shifted the step five burden of proof by relying on the absence of evidence. This is not, however, a situation in which the absence of evidence is made to serve as substantial evidence to meet the Commissioner's burden at step five, *cf. Thompson v. Sullivan,* 987 F.2d 1482, 1491 (10th Cir.1993), but rather one in which the relevant medical evidence in the record simply does not support plaintiff's claim of disabling pain. *See Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir.1990) (medical records must be consistent with nonmedical testimony as to severity of pain).

Relying on our decisions in *Weakley v. Heckler,* 795 F.2d 64, 66 (10th Cir.1986) and *Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir.1985), plaintiff also argues that the ALJ erroneously considered her failure to take pain medication in the absence of evidence that plaintiff had been prescribed pain medication and that it would have restored her ability to work if she had taken it. Plaintiff's reliance on these decisions is misplaced, because both involved the circumstances under which an ALJ may deny benefits because a claimant has refused to follow prescribed treatment. Here, the ALJ did not deny plaintiff benefits on the ground she failed to follow prescribed treatment, but rather, "the ALJ properly considered what attempts plaintiff made to relieve [her] pain--including whether [she] took pain medication--in an effort to evaluate the veracity of plaintiff's contention that [her] pain was so severe

as to be disabling." *Qualls,* 206 F.3d at 1372 (citing *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir.1991) and *Luna,* 834 F.2d at 165-66).

Plaintiff further argues that the ALJ erred in considering whether her lack of medical treatment for her pain and chronic fatigue problems is due to insufficient funds. The only evidence in the record concerning plaintiff's ability to pay for medical treatment is a notation in the treatment notes relating to her June 1996 medical evaluation for a stiff neck stating that plaintiff could not afford to have a thyroid scan. The record contains no evidence plaintiff sought medical treatment for her claimed disabling pain or for her claimed sleep and chronic fatigue problems, but was refused for an inability to pay. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir.1992) (holding failure to seek low-cost medical treatment and lack of evidence claimant had been denied medical care because of financial condition supported determination that claimant's financial hardship was not severe enough to justify failure to seek medical treatment).

**4** Plaintiff contends the ALJ erred in considering that she had not sought recent medical treatment for her claimed fatigue and depression because a person suffering from a mental impairment, particularly depression, may not recognize the need for treatment. Plaintiff relies upon *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996), which noted that claimants with mental health concerns often do not seek help at the first sign of a problem. In the instant case, however, unlike *Nguyen,* the ALJ did consider plaintiff's complaints of disabling fatigue and depression, which were not consistent with the treatment record nor with a consulting psychologist's contemporaneous assessment of plaintiff's condition. The plaintiff underwent a consultative psychological examination, and was diagnosed with mild depression, most likely of long-standing duration, but the consulting psychologist concluded that plaintiff was not significantly depressed and was capable of being retrained and placed in a job. The ALJ found that plaintiff's depression was mild and did not impose any degree of functional limitations on plaintiff's daily activities, social functioning, task mastering, or work abilities. We conclude the ALJ's assessment of plaintiff's

depression and fatigue is closely and affirmatively linked to substantial evidence. *See Winfrey v. Chater,* 92 F.3d 1017, 1020 (10th Cir.1996).

In the remainder of plaintiff's claims, she essentially disagrees with the weight the ALJ gave to the relevant factors. We, however, may not reweigh the evidence on appeal. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990). In evaluating the credibility of plaintiff's allegations of disabling pain, fatigue and depression, the ALJ considered the kinds of factors found to be appropriate in *Luna* and *Hargis,* and he recited what specific evidence he relied on in considering those factors, as required by *Kepler.* The ALJ applied the correct legal standards in evaluating plaintiff's subjective allegations and his determination on this matter is supported by substantial evidence in the record.

IV. Hypothetical

Finally, plaintiff contends the ALJ's hypothetical question to the VE was flawed because he failed to include the fact that she is blind in her left eye. [FN3] Plaintiff has had reduced vision in her left eye since she was five or six years old, and is able to see only shapes and forms with that eye. *See* Appellant's App. at 211-12. She retains 20/20 vision in her right eye, however. *Id.* at 212. With this vision problem, plaintiff was able to work as a groundskeeper, which included computer work preparing inventory and material safety data sheets, and as a waitress and construction worker. There is no evidence that her reduced vision in one eye interfered with her ability to work. Nor did plaintiff claim her vision impairment as a contributing cause of disability when she applied for benefits. The ALJ found that plaintiff's vision impairment in the left eye did not qualify as a disabling condition because plaintiff's vision in the right eye has been preserved. *Id.* at 15. His assessment that plaintiff's blindness in one eye would have a minimal effect on her ability to work is supported by evidence that she worked for many years despite her condition. *See Auer v. Secretary of Health & Human Servs.,*

830 F.2d 594, 596 (6th Cir.1987) ("[claimant's] blindness in one eye has little effect on the disability determination given his past work history").

FN3. In the "Summary of the Argument" portion of her brief, plaintiff mentions that the ALJ's hypothetical was flawed because it did not include her claimed bending and stooping restrictions or her claimed need to lie down and elevate her feet. *See* Opening Br. at 11. Plaintiff did not, however, argue either of these issues in her arguments relating to the ALJ's hypothetical. *See id.* at 30-32. An issue listed, but not argued in the brief on appeal, is waived. *See Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1231 (10th Cir.1990).

**5** The vocational expert testified she had reviewed the medical exhibits in the file and had heard plaintiff's testimony at the hearing. Moreover, plaintiff's testimony about her reduced left eye vision and her unimpaired right eye vision immediately preceded the ALJ's hypothetical question posed to the VE. *See* Appellant's App. at 239-40. Thus, although the ALJ did not expressly include this limitation in his hypothetical, we conclude that "[t]he fact the vocational expert was present and heard testimony concerning [plaintiff's vision impairment in one eye] suggests that the effect of the error, if any, in the administrative law judge's (ALJ) hypothetical, was minimal." *Diaz,* 898 F.2d at 777.

We have carefully reviewed the entire record, the parties' arguments, and the relevant law. For substantially the same reasons as set forth in the district court's opinion dated June 17, 1999, *see Allen,* 54 F.Supp.2d 1056, we conclude that the Commissioner's decision is supported by substantial evidence on the whole record and comports with the relevant legal standards. The judgment of the United States District Court for the District of Kansas is AFFIRMED.

216 F.3d 1086 (Table), 2000 WL 796081 (10th Cir.(Kan.)), 2000 CJ C.A.R. 3611 Unpublished Disposition

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works